No. 21,738.

W. F. PLETCHER, *Appellee,* v. THE CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY, *Appellant.*

SYLLABUS BY THE COURT.

1. COMMON CARRIER—*Interstate Shipment of Livestock—Failure to Furnish Cars—Damages—Form of Action.* The form of the action for damages for failure of a carrier to furnish cars to a shipper of livestock for an interstate shipment is not important. The ground of the liability is unjustifiable omission to furnish the cars, and it is not material that in an action for damages for failure to furnish cars requested for a particular day, the shipper predicates liability on breach of contract to furnish the cars on that day.

2. SAME — *Negligence of Carrier — Car Shortage.* The evidence examined, and held to warrant the jury in finding that the shipper's request for cars was negligently treated, and that the carrier was not excused from complying with the request because of sudden and great demands which it had no reason to apprehend would be made, and which it could not reasonably be expected to meet.

3. SAME—*Interstate Shipment—Provisions of Bill of Lading—No Waiver of Previous Loss from Carrier's Negligence.* Relying on compliance with his request for cars on a certain day, the shipper in due time placed hogs in the carrier's stockyard, for interstate transportation. Because of the carrier's failure to furnish the cars, 17 of the hogs died. After the remainder of the herd, 131 in number, were loaded

in belated cars, a bill of lading for them was issued, and was signed by the shipper. The bill of lading contained a provision that the carrier's liability should not attach until the livestock was loaded in the cars and a written shipping contract was issued. *Held*, the carrier's liability for loss of the hogs which died was not released or waived by the shipper.

Appeal from Smith district court; RICHARD M. PICKLER, judge. Opinion filed December 7, 1918. Affirmed.

*Paul E. Walker*, and *Luther Burns*, both of Topeka, for the appellant.

*A. W. Relihan, T. D. Relihan, F. W. Mahin*, and *I. M. Mahin*, all of Smith Center, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action was one for damages resulting from the defendant's failure to furnish stock cars for the timely shipping of two carloads of hogs from Bellaire, Kan., to Kansas City, Mo. The verdict and judgment were for the plaintiff, and the defendant appeals.

The form of the action was one for breach of a contract made on Tuesday, January 30, 1917, whereby the defendant agreed to furnish the cars for use on the morning of Sunday, February 4, 1917. The evidence was that the plaintiff lived nine miles from Bellaire, and kept his hogs in good, tight, covered pens. On Thursday he hauled in bedding for the open stockyard pens. On Saturday he brought in his hogs for shipment on the train leaving about daylight the next morning. On Sunday morning the cars did not arrive. The defendant's agent said the cars were over at Smith Center, a neighboring town, and he would try to have them at Bellaire the next morning. The cars did not come until Wednesday, February 7, when they were loaded and forwarded to their destination. It was winter weather, the thermometer standing at one degree below, two degrees above, and zero, at Smith Center, February 3, 4, and 5. The hogs piled up in the stockyard pens, some were overlaid, others would come steaming from the piles into the cold air, and as a result, by Wednesday morning the plaintiff had lost seventeen hogs.

The defendant denied that it agreed to furnish cars on any particular day. The request for cars was made to a helper about the defendant's station at Bellaire, and not to the agent in charge; there was testimony that the agent had no authority to make a contract to furnish cars on any particular day; and the bill of lading which was issued to the plaintiff after the cars arrived and were loaded contained a provision that no agent had authority to agree to furnish cars on any particular day. The subject is not important. A request for cars for use on February 4 was made, the defendant recognized and acted on the request, and there is no contention that the request was not reasonable.

The transportation was confessedly interstate, and governed by federal law. Under the commerce act, "transportation" includes the entire body of services rendered in connection with the receipt, handling, and delivery of property transported, and includes the furnishing of cars:

"The term 'transportation' shall include cars and other vehicles and all instrumentalities and facilities of shipment or carriage, . . . and all services in connection with the receipt, delivery, . . . and handling of property transported; and it shall be the duty of every carrier subject to the provisions of this act to provide and furnish such transportation upon reasonable request therefor." (Commerce Act, § 1, 24 U. S. Stat. at Large, 379, as amended by 34 U. S. Stat. at Large, 584, 36 U. S. Stat. at Large, 544 [4 Fed. Stat. Ann., 2d ed., 351].)

Section 8 of the act provides that in case any carrier shall omit to do any act required to be done, it shall be liable for the full amount of damages sustained. Section 20 provides that any carrier shall be liable to the holder of a bill of lading for any loss, damage or injury to the property which it causes. Section 22 preserves other rights and remedies not inconsistent with the act, and the form of the action for failure to furnish cars is not material. In the case of *Penna. R. R. v. Puritan Coal Co.*, 237 U. S. 121, the court said:

"It makes little difference what name is given the cause of action sued on in the present case; or whether it is treated as a suit for a breach of the carrier's common-law duty to furnish cars, or an action for damages for the carrier's unjust discrimination in allotting cars. . . . In either case the liability is the same. . . . The damages grew solely out of the fact that the Puritan Company failed to receive the number of cars to which it was entitled." (p. 132.)

Pletcher v. Railway Co.

In this case the facts of the transaction relating to the application for cars were stated, and it makes no difference that the plaintiff characterized his grievance as one for breach of contract. The essential nature of the defendant's liability, if any, was the same, and the court properly instructed the jury that the plaintiff must recover, if at all, because of the failure of the defendant to furnish cars within a reasonable time.

The defendant sought to excuse the delay in furnishing cars on the ground of car shortage resulting from sudden and extraordinary demands. In the opinion in the Puritan Coal Company case just cited may be found some observations on this subject which are quite pertinent:

"The carrier is not liable if its failure to furnish cars was the result of sudden and great demands which it had no reason to apprehend would be made and which it could not reasonably have been expected to meet in full. . . . The law exacts only what is reasonable from such carriers—but, at the same time, requires that they should be equally reasonable in the treatment of their patrons. In case of car shortage occasioned by unexpected demands, they are bound to treat shippers fairly, if not identically. In determining how the inadequate supply shall be distributed, it might be necessary to consider the character of the freight tendered—whether perishable or staple and whether a necessity of life needed in crowded citities and the like." (p. 133.)

In accordance with this doctrine, the court instructed the jury that if the defendant possessed sufficient cars to meet all ordinary demands, but that there was an undue shortage caused by unusual press of business or extraordinary congestion of traffic, which could not reasonably be anticipated or provided for, and the defendant could not meet the unprecedented demand, but did distribute cars fairly and without discrimination, and did furnish the plaintiff's cars as soon as possible under the circumstances, the plaintiff could not recover. The question thus presented was a question of fact, which the verdict necessarily determined against the defendant. The defendant contends the verdict was contrary to the evidence.

The freight-car distributor for the Rock Island system, whose office was at Chicago, testified that in the year 1915 the car supply in general afforded somewhat of a surplus, but that starting with the first of the year 1916 shortages "began to increase," due to increase of traffic, which he said "exists to-day" (December, 1917). The witness said the Rock Island

system had enough stock cars for all ordinary demands, and that the condition from 1916 to the time of the trial had been extraordinary and quite unprecedented in the history of railroading; but when called on to explain the conditions which produced the shortage, the witness depended largely on factors which were nonexistent in the year 1916 and in January and February, 1917. He said:

"The large volume of business has largely been created by war necessity, the moving of troops and of goods and materials to maintain those troops, all these preparations and ammunitions, and in addition to that increase of business the increase of our individual shippers all over the country."

Testifying as to how the stock-car supply had been affected "since 1917," he said the demand for box cars had been so great that in order to comply with government regulations they had been obliged to paper the inside of stock cars, and so diminish the supply for livestock. Testifying further, he said:

"Briefly, there has been a steady increase, due to the demands on transportation lines in general, not only railways, but all other common carriers, have had a demand on them for the increase in business, due, as I previously stated, to the condition of maintaining our army and the government requirements."

We did not sever diplomatic relations with Germany until February 3, 1917, and the existence of a state of war was not proclaimed until April 6, 1917.

Accounting for the difficulty in obtaining new equipment, the witness said the steel situation was the principal factor, the steel foundries being under government control and their products being taken for other purposes, including the needs of the allied countries. The steel industry was not coördinated with government activities until after we entered the war. The witness said the cost of an ordinary box car two years before (December, 1915) was about $1,200, and the price at the time of the trial (December, 1917) was about $2,700. December, 1915, was very near the time he claimed car shortage commenced to appear on his road.

Records of the system car distributor and of the division car distributor were produced, showing the daily demand and the daily available supply of cars on the Bellaire division from January 25 to February 7, 1917. Those records did not agree, for reasons which were stated, but they disclosed a car short-

Pletcher v. Railway Co.

age on the Bellaire division.    It was the business of the division distributor to apportion cars among different stations on his division.    He compiled his data from the reports of station agents, and sent his orders for cars to the Chicago office. The system distributor distrbuted cars among the various divisions.    The record of the division distributor, as stated to the jury, was as follows:

"January 30th, ninety-five wanted, fifty-five on hand.    Three ordered Bellaire, three on eighty-three to fill order—Number eighty-three is our local train.    January 31st, fifty-nine wanted, fifty-one on hand.    None ordered Bellaire.    February 1st, fifty-nine ordered, fifty-eight on hand. Two ordered, none on hand Bellaire.    February 2nd, eighty-one ordered, sixty on hand.    Two ordered Bellaire for 4th.    None on hand."

Fom the fact that special orders for particular uses were noted on the record—"three on eighty-three," "two ordered Bellaire for 4th"—it would appear that the plaintiff's request for cars did not receive attention until the day after the plaintiff had bedded the stockyard pens for the reception of his hogs.

The records just referred to disclosed a condition.    They did not explain the condition, and eliminating government need, government priorities, and government regulation and control following our entrance into the war, no sudden great demand for cars which the defendant had no reason to apprehend, and which it could not reasonably be expected to meet, was fairly disclosed.    There was a "steady increase" in the volume of traffic, beginning with the first of the year 1916, which culminated in an acute shortage of cars in January, 1917.    The cause of this increase was well known to all men. It lay in the great expansion of trade and industry generally, as the result of demands made on the United States arising out of what was still essentially a European war.    By the beginning of 1916, a full year before the plaintiff made his request for transportation, every barometer used in gauging business activity was steadily rising, and the effect on railroad transportation was already patent.    As a matter of fact, according to statistics compiled by the Commercial and Financial Chronicle (not embraced in the record), this expansion was registered in railroad revenues as early as September or October, 1915, and there continued to be a net surplus of idle cars until September 1, 1916, when the first shortage for that year, amounting to approximately 20,000 cars, appeared.    However

this may be, while the expansion was quite rapid after it once gained headway, and while it assumed unprecedented proportions before the end of 1917, it had ceased to be sudden or unexpected by the beginning of 1916. Every day's experience instructed the defendant that it would become less and less capable of fulfilling the demands made upon it, and the abstract is barren of any testimony that any effort was made to meet the needs of the growing number of shippers and the swelling volume of traffic, beyond shifting from division to division an increasingly inadequate supply of cars.

Of course this court does not hold that the defendant was not excused from complying with the plaintiff's request. It does hold that, from the evidence produced at the trial, the jury were warranted in finding that the defendant was not excused, both on the ground just discussed and on the ground of negligence in handling the plaintiff's request.

After the hogs which were still alive were loaded in the cars finally furnished, the defendant presented to the plaintiff for signature a bill of lading or contract for the shipment, which he signed. The instrument provided that the liability of the defendant should not attach until the livestock had been loaded into the cars by the plaintiff and a written shipping contract had been issued. The court refused to instruct the jury, at the defendant's request, that this provision of the contract governed, and that the plaintiff released and waived any claim for damages arising before the contract was signed.

The defendant argues that under the definition of transportation contained in the commerce act, transportation began with the plaintiff's request for cars; that section 20 of the act required the defendant to issue a receipt or bill of lading for the shipment; that under the act a bill of lading is an essential incident to transportation; and that being in form and in essence a contract, its terms must necessarily be binding. The general soundness of this argument may be conceded, but it does not cover this case. The contract which the plaintiff signed specified the subject to which it related. That subject was the transportation of 131 hogs of the value of $20 each, at a rate graduated and proportioned according to the declared value, from the station of Bellaire to Kansas City, Mo., consigned to Clay, Robinson & Co. Those were live hogs which

went forward to their destination, and not dead ones which the plaintiff hauled back to his farm. No receipt or bill of lading was issued for the 17 dead ones.

Besides what has just been said, the shipper was entitled to transportation for the hogs which were shipped, at the tariff rates, and it would be a manifest discrimination against him, not based on cost of service, to cause him to surrender, in addition to proper transportation charges, the amount of his damages, fully accrued on account of a breach of duty expressly enjoined by the commerce act. In this instance the shipper would be charged $340 in addition to lawful freight charges for the transportation of 131 head of hogs, which would constitute extortionate discrimination, repugnant alike to the letter and spirit of the law. To say that the contract is in form and substance the one tendered to all shippers is to say that **transportation charges are indefinite and uncertain, depending on what damages a shipper may have sustained before signing the contract, which is repugnant to the letter and spirit of the law. In this instance the only effect** of the provision was to relieve the carrier from the consequences of its negligent delay in furnishing transportation, up to the time the cars were loaded. In the case of *Boston & Maine Railroad v. Piper*, 246 U. S. 439, involving a stipulation in a bill of lading limiting to certain items liability for delay occasioned by the carrier's negligence, the court said:

"This stipulation contravenes the principle that the carrier may not exonerate itself from losses negligently caused by it, and is not within the principle of limiting liability to an agreed valuation which has been made the basis of a reduced freight rate. Such stipulations as are here involved are not legal limitations upon the amount of recovery, but are in effect attempts to limit carrier's liability for negligence by a contract which leaves practically no recovery for damages resulting from such negligence. While this provision was in the bill of lading, the form of which was filed with the railroad company's tariffs with the Interstate Commerce Commission, it gains nothing from that fact. The legal conditions and limitations in the carrier's bill of lading duly filed with the Commission are binding until changed by that body (*Kansas City Southern Ry. Co. v. Carl*, 227 U. S. 639, 654); but not so of conditions and limitations which are, as is this one, illegal, and consequently void." (p. 445.)

Williams v. Flour Mills Co.

· The result is that the stipulation under consideration did not cover the liability on which the action was predicated; but if it should be construed to cover such liability, the stipulation was void.

The defendant argues that the delay in furnishing cars was not the proximate cause of the plaintiff's loss. This was a hotly contested question at the trial. There are pages and pages of testimony relating to it, and it is sufficient to say there was ample evidence to sustain the verdict.

There is nothing more in the case of sufficient importance to require discussion, and the judgment of the district court is affirmed.